# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00174-COA

JEREMIAH FEARS                                                    APPELLANT

v.

STATE OF MISSISSIPPI                                              APPELLEE

DATE OF JUDGMENT:            12/13/2022
TRIAL JUDGE:                 HON. KENT E. SMITH
COURT FROM WHICH APPEALED:   CHICKASAW COUNTY CIRCUIT COURT,
                             FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: ZAKIA BUTLER CHAMBERLAIN
ATTORNEY FOR APPELLEE:       OFFICE OF THE ATTORNEY GENERAL
                             BY: CASEY B. FARMER
DISTRICT ATTORNEY:           BENJAMIN F. CREEKMORE
NATURE OF THE CASE:          CRIMINAL - FELONY
DISPOSITION:                 AFFIRMED - 02/18/2025
MOTION FOR REHEARING FILED:

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1. A woman in search of a used car saw an advertisement for one on Facebook Marketplace. Accompanied by her stepfather, she went to meet the seller. But when they arrived, there was no car. Instead, three men ambushed the family. The daughter was robbed, and her stepfather was killed in the altercation. The three men were arrested. The man who posted the ad was charged and ultimately convicted of capital murder, armed robbery, conspiracy to commit armed robbery, and aggravated assault.

¶2. On appeal, he claims he was improperly denied an accomplice jury instruction. Finding no abuse of discretion, we affirm.

## FACTS

¶3.    In October 2020, Alexis Tallant began searching for a used car on Facebook Marketplace. Alexis had $5,800 in cash that her grandparents kept in a safe for her. She found a used 2012 Nissan Maxima in her price range. The post was listed under the name "Harris Jaques." Police later discovered that the account could be traced back to the IP address where a man named Jeremiah Fears lived.

¶4.    Fears communicated with Alexis over the course of the next five days. The first two days, they negotiated the car's price through Facebook Messenger. After finalizing the price over the next three days, the two continued communications via their phones.

¶5.    After messaging for a few days, Alexis and her stepfather, Robert Cox, drove to Houston, Mississippi, to purchase the Maxima. Based on Fears' instructions, they were to meet at "Jamison Street houston ms . . . townhouse in[ ]front of kfc[.]" But Fears unexpectedly changed the location of the sale from the townhouse to 368 Martin Luther King Drive—an address next door to his home. After Alexis and Robert arrived at the location, they parked on the street and saw the Maxima in a nearby driveway. The two then got out of their car to inspect the Maxima.

¶6.    A man came out from behind the house. He pulled out a gun with an extended magazine. The man put the gun to Robert's head. He demanded the money. Alexis threw the money for the car toward the man's feet.

¶7.    Then two more men emerged from behind the house. One was holding an aluminum

2

baseball bat. Attempting to escape, Robert pushed the gun away from his face, but then the man with the bat began beating him "in the head."

¶8.     Alexis backed away and pulled her own .380 pistol from her purse. She attempted to fire at the men, but her gun jammed. After dislodging a bullet, she was able to fire one shot toward the gunman.

¶9.     The men fired back, shooting an estimated six times at Alexis and Robert. Robert was shot and died as a result.

¶10.    After a police investigation, Fears was arrested and indicted for capital murder for the death of Robert, armed robbery, conspiracy to commit armed robbery, and aggravated assault against Alexis.

¶11.    Two other men, Jarquavius Doss and Lamarius Spraggins, were also indicted for the crimes. Before trial, Spraggins plead guilty to accessory after the fact to murder and accessory after the fact to aggravated assault. He agreed to testify against his co-defendants. A jury convicted Doss of all counts on October 12, 2022.[1] Fears' trial was set for two months later, in December 2022.

## PROCEDURAL HISTORY

¶12.    At trial, the State called Curt Meyers, an officer with the Houston Police Department. Officer Meyers was the first police officer to arrive at the scene of the incident, and he spoke

---

[1] Doss' convictions were affirmed in *Doss v. State*, No. 2022-KA-01185-COA, 2024 WL 3155938 (Miss. Ct. App. June 25, 2024), *cert. denied* (Miss. Dec. 24, 2024).

3

to Robert before he succumbed to his injuries. Officer Meyers disclosed that Robert told him he and Alexis "were there to buy a car," but instead, "he was shot" and "hit with a baseball bat." The officer further testified that Robert said "three black males" inflicted his harm. Officer Meyers collected 9mm shell casings at the location as well.

¶13.    Next, Adam Harmon, an officer for the Chickasaw County Sheriff's Office at the time of the incident, testified. When asked about Fears' demeanor that day, he stated that Fears "was all over the place . . . [like] he didn't want to tell me exactly what was going on or who he was," and "he was really nervous acting." But Fears "said he didn't hear anything or see anything." Similar to the other officer, Officer Harmon also testified to finding shell casings close to Fears' home. The day after the shooting, Officer Harmon told detectives that they "may need to speak to [Fears]" because he was concerned that Fears was involved in the murder.

¶14.    Alex Jackson, an officer for the West Point Police Department at the time of the incident, also testified. He explained that Fears called him on the night Robert was killed, "wanting to report a gun stolen." The officer told Fears that he needed to come in person to make the report, and Fears complied. Fears went to the police station around 11:30 on the night of the shooting. Officer Jackson testified that when he made the report, Fears presented a receipt for the gun, which showed that the gun was a black 9mm handgun with an extended magazine.

¶15.    Tommy Bishop, a forensic scientist, was accepted as an expert in firearms and tool

mark analysis and identification. Bishop testified that the bullet recovered from Robert was "consistent with a 9-millimeter projectile." He also confirmed to a reasonable degree of certainty that the bullet was not from a .380-caliber handgun, ultimately excluding Alexis' gun as the cause of her stepfather's injuries.

¶16.    The State then called medical examiner Dr. David Arboe without objection. Dr. Arboe concluded that "the cause of death in this case [was a] gunshot wound of the chest and blunt force injuries."

¶17.    The State subsequently called Lamarius Spraggins, one of Fears' co-defendants. Spraggins received a plea deal in exchange for his testimony against Fears. He plead guilty to accessory after the fact to murder and accessory after the fact to aggravated assault. Under that plea agreement, Spraggins could receive a maximum term of forty years in prison.

¶18.    Spraggins testified that on the day of the incident, he parked his Nissan Maxima at the abandoned house next to Fears' home. He then went with Fears and Jarquavius Doss behind the abandoned house. Spraggins said Fears was texting on his phone while they smoked marijuana.

¶19.    Spraggins heard a car pull up. He told the jury that Doss went to the front of the house, "and that's when [he had] seen Fears pick up the bat . . . [a]nd start[] walking towards the front." Spraggins followed Fears and saw a man and a woman. He testified that when he got to the front yard, "Doss had a black gun" and "rose the gun to the white man and told him to give it up." Spraggins stated that the man swatted at the gun, and then "Fears came over

with the bat and started swinging," hitting the man with "multiple, multiple swings." The man had his hands up in a defensive position before falling to the ground. Spraggins testified that he "heard the lady let off a shot," and "[a]fter she fired, that's when Doss had fired his [gun]." He explained that at that point, he ran to his car with Doss and took Doss home. During the drive, Doss told Spraggins that "we just tried to hit a lick and f***ed up."

¶20.    Dwight Parker, a criminal investigator for the Chickasaw County Sheriff's Office, was called after Spraggins. Investigator Parker stated that he interviewed Fears the day after the incident, during which Fears made no mention of Spraggins, Doss, the Facebook post, or the murder outside his home. But Investigator Parker testified he suspected Fears' involvement because he called the Chickasaw County Sheriff's Office to report a gun stolen on the night Robert was murdered. According to Investigator Parker, "the dispatcher . . . told [Fears] he was going to have to come to the sheriff's office to report it stolen. [Fears] told them he didn't want to come to the sheriff's office, wanted to report it over the phone, and then he just wound up not coming[.]"

¶21.    A written statement that Fears signed the day after Robert was killed stated, "My gun got stolen about 2 weeks ago in West Point. I reported the gun to West Point PD on 10/26/2020 . . . . It was a Taurus 9mm Black. I called Chickasaw 911 to report it stolen . . . after I reported it to West Point." Fears contradicted himself seven months later in a second, recorded interview when Fears claimed he called Chickasaw County deputies first to figure out how to report the stolen gun to West Point Police.

¶22. During his second interview, Fears told Investigator Parker that "he had set [the post] up[.]" He also admitted that he repeatedly communicated with Alexis. Lastly, he identified Doss as the possible shooter.

¶23. Terry Ward, an investigator with the Chickasaw County Sheriff's Office, testified that the investigation into Robert's death started with the Facebook post. He explained that he contacted Facebook, which confirmed that the "Harris Jaques" account belonged to Jeremiah Fears. Law enforcement then traced the account and the Facebook Marketplace ad to Fears' home at 370 Martin Luther King Drive. Authorities also obtained information from AT&T identifying the IP address connected to the text messages, which was also traced to 370 Martin Luther King Drive. The phone number used to communicate with Alexis was determined to belong to Fears.

¶24. In his second interview with law enforcement, Fears admitted that he made the Facebook Marketplace ad to help Doss sell his car. He further admitted to Investigator Ward that he sent the texts and Facebook messages to Alexis and that the pictures of the Nissan Maxima were "copied and pasted . . . from something he got off the internet[.]"

¶25. The State called Alexis Tallant as its final witness. Alexis explained that she communicated with Fears over Facebook and text messages, and the pair eventually agreed to meet for the sale of the car. The day before the sale was supposed to take place, Fears texted Alexis, "5800$ cash?" and she replied, "Yeah! I've got it with me." Fears and Alexis agreed to meet at a townhouse that allegedly belonged to Fears' aunt in Houston. On the day

7

of the sale, Alexis informed Fears that she and Robert were on the way to Houston when Fears messaged her asking, "[W]ho all coming [a]gain[?]" She replied, "It's just me and my dad!"

¶26. After arriving at the agreed-upon location, Fears texted Alexis, "Could somebody be standing outside [the vehicle] so I'll know i[t']s you[?]" Alexis responded, "We are the only car in the parking lot with the lights on!" She then received a text message from Fears changing the meeting location to 368 Martin Luther King Drive, still in Houston.

¶27. When Alexis and Robert arrived at the new location, they saw a Nissan Maxima parked in the driveway of a house that "looked unoccupied" and got out of their car to inspect it. Alexis testified that a man approached them and asked, "Did you bring the money that we agreed on[?]" She told the man that she had the money, and then the man "took his gun out and put it to [her] stepdad's head and said, yeah, I'm going to need that." Alexis testified that she threw the money toward the man, and then the two other males approached. She further described that "[i]t was a black handgun with an extended clip."

¶28. After law enforcement arrived at the scene, Alexis spoke with Officer Meyers and Officer Harmon, who asked her to identify the shooter. Alexis told investigators that she "thought [she] could" identify the men. Although Fears was among the men placed in the lineup, Alexis told detectives that "he was not the shooter." At a separate time, Alexis identified Jarquavious Doss as the shooter. On redirect, the State asked Alexis, "[B]etween October 26th, 2020, and today, have you learned that [Fears, Doss, and Spraggins] have

admitted to having some involvement in this?" Alexis agreed and further stated that all three men fit the descriptions that she gave law enforcement after the incident.

¶29. Following Alexis's testimony, the State rested. Fears moved for a directed verdict, but the trial court denied the motion, finding that the State "met the burden of presenting a prima faci[e] evidence case that would allow it to be considered . . . by the jury."

¶30. Ultimately, the jury found Fears guilty of all counts: capital murder for the death of Robert, armed robbery, conspiracy to commit armed robbery, and aggravated assault against Alexis. Fears was sentenced to life in prison without eligibility for parole for capital murder and to serve fifty years in the MDOC's custody for armed robbery, five years in custody for conspiracy to commit armed robbery, and twenty years in custody for aggravated assault. Fears moved for a judgment notwithstanding the verdicts or, in the alternative, a new trial. The court denied the motion. Fears appeals raising only one issue.

## DISCUSSION

### The trial court properly rejected a cautionary jury instruction.

¶31. On appeal, Fears argues that the trial court erred in refusing to give a cautionary instruction to the jury. Specifically, he contends that "Spraggins's testimony was the only evidence that placed [him] at the scene of the robbery and established [him] as a co-conspirator." So he argues a cautionary jury instruction should have been given as a result of "Spraggins['] highly prejudicial" and "uncorroborated testimony," which according to Fears "was the primary and sole evidence at the crux of [his] conviction[.]"

9

¶32.    "The long-standing standard of review for the trial court's giving or refusing jury instructions is an abuse of discretion." *Clay v. State*, 345 So. 3d 628, 630 (¶8) (Miss. Ct. App. 2022). "Although granting a cautionary instruction regarding the testimony of an accomplice is within the trial judge's discretion, such an instruction is required when the accomplice's testimony is the sole basis for the conviction, and the defendant's guilt is not clearly proven." *Warren v. State*, 269 So. 3d 1207, 1209 (¶9) (Miss. Ct. App. 2018) (citing *Williams v. State*, 32 So. 3d 486, 490 (¶12) (Miss. 2010)). Mississippi has a two-part test to determine if the trial court has abused its discretion in this context. *Amos v. State*, 363 So. 3d 601, 605 (¶17) (Miss. 2017). "First, it must be determined if the witness was in fact an accomplice. If that prong is met, we determine secondly if the testimony was without corroboration." *Id*. (quoting *Brown v. State*, 890 So. 2d 901, 910 (¶22) (Miss. 2004)).

¶33.    Recently, this Court concluded that a defendant was not entitled to an accomplice jury instruction because evidence other than the accomplices' testimony supported the conviction. *LeCompte v. State*, 373 So. 3d 796, 802 (¶18) (Miss. Ct. App. 2023). In *LeCompte*, a woman noticed that unauthorized checks were being written from her account. *Id*. at 798 (¶2). After being arrested, a second woman admitted that she cashed the checks but "claimed that [the defendant] had misrepresented to her that [the checks] had been given . . . by [the account holder]," and the defendant "could not cash the checks himself because he did not have an ID." *Id*.

¶34.    At trial, the second woman was found to be an accomplice because she "was

implicated as being centrally involved in the commission of the crime[.]" *Id.* at 801 (¶15). However, the defendant's fingerprints were found on some of the forged checks, which served to further corroborate the conviction. *Id.* at 802 (¶17). Furthermore, a third party who was not an accomplice testified that he saw the defendant with the account holder's checkbook. *Id.* This Court found that the trial court did not err in refusing an accomplice instruction because the "accomplice testimony was not the only evidence presented that supported the State's case." *Id.* at (¶18).

¶35.　Similar to *LeCompte*, Fears argues that Spraggins' accomplice testimony was "the only evidence that placed Fears at the scene of the robbery and established Fears as a co-conspirator." Using the two-prong test to determine if an accomplice instruction was warranted, it is clear that this argument is flawed.

¶36.　First, Fears and Spraggins were accomplices. "An accomplice is 'a person who is implicated in the commission of the crime'. . . [, and] [i]f the evidence gives a reasonable inference that the person may have been a co-perpetrator or the sole perpetrator, then that person is an accomplice." *LeCompte*, 373 So. 3d at 801 (¶14) (quoting *Hye v. State*, 162 So. 3d 818, 823 (¶16) (Miss. Ct. App. 2013)). Our inquiry on this point is straightforward. Spraggins admitted to being centrally involved in the commission of the crimes against Robert and Alexis. He also implicated Fears in the commission of the crimes and in their conception.

¶37.　An accomplice jury instruction is only warranted if no other corroborating evidence

11

supported the conviction. *LeCompte*, 373 So. 3d at 802 (¶18). Here, the record is replete with evidence that Spraggins' testimony was not the sole basis for the conviction. Fears admitted to investigators that he posted the ad for the Maxima. But the ad was fiction—Fears told investigators that he copied and pasted photos of a Maxima that he found online for the Facebook Marketplace ad.

¶38.    Furthermore, Facebook confirmed that the "Harris Jaques" account belonged to Fears and that the messages were sent from the home where he lived. AT&T also confirmed that the phone number used to message Alexis belonged to Fears.

¶39.    For the better part of a week, Fears communicated with Alexis in multiple ways. First, he used Facebook Messenger to negotiate a price with Alexis. After finalizing the price, Fears texted Alexis over the course of several days to arrange an in-person meeting. On the day of the ambush, Fears texted and called Alexis. Using Facebook Messenger, text messages, and phone calls, Fears meaningfully participated in luring Alexis and her stepfather to come to Houston. He made sure that she was going to bring cash and probed for information regarding whether Alexis was coming to the sale alone. Once Alexis and her stepfather arrived—exactly where Jeremiah Fears told them to be—it is undisputed they were attacked by three men.

¶40.    Therefore, ample evidence other than Spraggins' testimony supports Fears' guilt. Because "an accomplice instruction is only warranted where the accomplice testimony is uncorroborated, and the accomplice's testimony is the only evidence presented that supports

12

the defendant's guilt," the trial court did not err in refusing Fears' accomplice instruction. *LeCompte*, 373 So. 3d at 802 (¶18).

## CONCLUSION

¶41. Based on the reasoning above, the trial court did not abuse its discretion in refusing to give the jury an accomplice instruction. We affirm Fears' convictions and sentences.

¶42. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**